# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

HEIDI A. WINKEL,

     **Plaintiff,**

     **v.**                              **Case No. 24-CV-1138-SCD**

**FRANK J. BISIGNANO,**
*Commissioner of the Social Security Administration,*

     **Defendant.**

---

## DECISION AND ORDER

---

Heidi Winkel worked numerous low-paying, part-time jobs throughout her forty-five years, but she never held a full-time position. She eventually applied for social security disability benefits, alleging that she was unable to work due to bipolar disorder and anxiety that caused difficulties concentrating, getting along with others, and handling stress. An administrative law judge determined that Winkel was capable of full-time competitive employment despite her severe mental impairments.

Winkel seeks judicial review of that decision, arguing that the ALJ erred in evaluating her alleged mental symptoms and certain medical opinion evidence. I agree that the ALJ's subjective-symptom evaluation lacks logical support in the record, that the ALJ failed to provide a good explanation for rejecting the opinion of an examining psychologist, and that the ALJ didn't comply with binding social security regulations when assessing the opinions of Winkel's treating psychiatrist. Accordingly, I will reverse the decision denying Winkel disability benefits and remand the matter for further proceedings.

# BACKGROUND

In 2021, Winkel applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, claiming that she was unable to work due to various physical and mental impairments.

## I. Vocational and Medical Background

Winkel was born in 1978 and grew up around Sheboygan, Wisconsin. *See* R. 957.[1] She did well in high school and attended college at CU Bolder but dropped out after just one semester. *See* R. 41–42, 336, 724. Winkel returned to the Sheboygan area and eventually was married and had two children. *See* R. 242, 725, 754. She got divorced in 2016 and later had two other children from different relationships. At the time she applied for disability benefits, Winkel had custody (or at least partial custody) of the two youngest kids. *See* R. 242, 247, 705. The father of the youngest one was incarcerated for a domestic incident with Winkel. *See* R. 752, 755–56, 975. Winkel said she struggled balancing the responsibilities of being a single parent, but she did her best to get by. *See* R. 753–55, 932, 953, 1012.

Over the years, Winkel worked countless part-time jobs—literally, there's so many she can't even remember them all—mostly in customer service and retail. *See* R. 263–328, 336–37, 428, 724, 755, 760, 932, 978. Her recent jobs included delivering pizzas, driving for Lyft, and cleaning houses while her kids were in school. *See* R. 42, 243, 336, 735–36, 770, 920, 929–30, 932, 1029, 1145. Winkel typically found work though staffing agencies as part of state-sponsored vocational programs. *See* R. 46–47, 340, 397–433, 755, 921. She has never had a full-time job. *See* R. 42–43, 736.

---

[1] The transcript is filed on the docket at ECF No. 11-1.

2

Although she suffers from several impairments, Winkel claimed the biggest barrier to full-time employment was her mental health. *See* R. 43–46. Her mental health issues date back to age eighteen or nineteen, when she was hospitalized for several months following a psychotic breakdown. *See* R. 341, 705, 724, 754, 977. After leaving the mental hospital, Winkel participated in counseling and was prescribed various psychotropic medications for rapid-cycling bipolar disorder and generalized anxiety disorder. *See* R. 459–590, 965–79. She was hospitalized a few other times, though not since the early 2000s. *See* R. 705, 932. Winkel took a break from her meds while pregnant with and breastfeeding her youngest child. *See* R. 705–14, 965–79. She resumed Lamictal (an anticonvulsant used to treat bipolar disorder) in November 2019 and participated in individual therapy; however, her treatment tailed off during the coronavirus pandemic.

In April 2021, Winkel reestablished care through Sheboygan County Health and Human Services. *See* R. 753–56. She presented as slightly anxious and with somewhat pressured speech and slightly paranoid thinking during the intake assessment. She also described fluctuating moods that resulted in good and bad days. The therapist diagnosed bipolar disorder type II, recommended continued individual therapy, and referred Winkel to psychiatry. During her therapy sessions, Winkel reported difficulty handling the stress and anxiety of being a single parent and trying to make ends meet. *See* R. 946, 953, 955, 959. She also reported racing, negative thoughts, especially regarding how others perceived her. The therapist noted that at times Winkel appeared distractible and was difficult to follow and redirect.

In June 2021, Winkel started seeing Daniel Knoedler for psychiatric care. *See* R. 957–58. She generally endorsed a continued switch between periods of mood elevation during

3

which she was anxious, hyper-focused, and irritable and periods of depression, though Dr. Knoedler noted that Winkel didn't clearly describe her symptoms. Dr. Knoedler did not observe any evidence of psychosis during the initial evaluation, and Winkel's cognitive status was within normal limits. He diagnosed atypical bipolar disorder and prescribed Lamictal. At a follow-up appointment the next month, Winkel reported feeling a little better since getting back on meds. R. 717. However, she continued to have a lot of stress at home, and she exhibited a moderately anxious affect. Dr. Knoedler increased the Lamictal dosage at that appointment and again a few months later. *See* R. 717–18. In October 2021, Winkel indicated that the increased dosage was somewhat helpful, but she still had periods of anxiety and racing thoughts throughout the day. R. 719. Dr. Knoedler prescribed Seroquel.

In December 2021, Winkel started seeing a different psychiatrist, Elaina Klimchuck. *See* R. 720. Winkel exhibited normal speech, a good mood, full-range affect, linear and goal-directed thought process, and adequate insight and judgment during her initial mental status examination. Nevertheless, Dr. Klimchuck increased the Seroquel dosage. Dr. Klimchuck increased the Seroquel dosage again at two follow-up appointments, and in February 2022 she added Buspar to Winkel's treatment regimen. *See* R. 721–22. Winkel reported feeling much better after starting the new medication. R. 723.

It appears Winkel went without treatment for several months before resuming therapy in November 2022. *See* R. 757. At that session, Winkel was appropriately groomed, oriented, and cordial. However, her mood was sad (tearful at times), she was mildly anxious, and she reported intrusive thoughts about suicide and giving her children up for adoption when her emotions ran high. During follow-up sessions, Winkel was tearful at times, and she frequently exhibited a talkative mood, tangential thoughts, and anxiety. *See* R. 758–59, 763–65, 767.

4

In December 2022, Winkel started seeing Steven Ortell for psychiatric care. *See* R. 724–26. Dr. Ortell noted that Winkel was well-groomed and straightforward; made good eye contact; followed the conversation without difficulty; had a good continuity of thoughts; exhibited no evidence of hallucinations, psychosis, or delusional thinking; and was cognitively oriented to person, place, and time. Winkel did, however, endorse intermittent suicidal ideation when overwhelmed. Dr. Ortell diagnosed bipolar disorder type I with psychotic features and added Lithium to Winkel's growing medication list. Winkel frequently told Dr. Ortell that she felt overwhelmed and had issues with mood instability. *See* R. 766, 920, 925, 929, 932, 1145. Although Winkel's mental status exams were generally unremarkable, Dr. Ortell observed her to be distressed and tearful at times, and he noted that Winkel struggled a lot with her anxiety interfering with her capacity to complete tasks. Dr. Ortell also continued to add new medications, including Risperdal, Wellbutrin, and Valium.

In May 2023, Winkel began psychotherapy with Benjamin Bechle. *See* R. 768. Winkel's therapy sessions focused on her difficulties with parenting and interacting with others. *See* R. 768–70, 916–19, 921–24, 926–28, 930–31, 987, 1012, 1141. She said she worried too much, she consistently steered conversations down a negative path, and she was preoccupied with how others perceived her. Although at times Winkel was tearful when discussing her struggles, Bechle's therapy notes consistently document her as euthymic. The notes also indicate that Winkel presented as well-groomed; was oriented to person, place, and time; had an affect consistent with her mood; and denied suicidal ideation.

In February 2024, Winkel reported increased anxiety and irritability since the holidays and recently going to urgent care for a nerve issue in her arm and neck. *See* R. 1003. Dr. Ortell

5

and Bechle addressed Winkel's concerns during a joint phone call. Dr. Ortell prescribed Sertraline and Valium.

In May 2024, Dr. Ortell completed a mental impairment questionnaire in support of Winkel's disability applications. *See* R. 1136–38. Dr. Ortell indicated that he had seen Winkel every four to seven weeks since December 2022. He noted that he diagnosed bipolar disorder type I with psychotic features and that Winkel's treatment included psychotherapy and several psychotropic medications. When asked to describe the clinical findings that demonstrated the severity of Winkel's impairments and symptoms, Dr. Ortell pointed to an unstable sleep cycle; an ability to manage only a simple, highly structured routine; a lot of anxiety; many past failures attempting to work full time; and limited ego strength. Similarly, as to signs and symptoms, Dr. Ortell checked boxes endorsing appetite disturbance with weight change, decreased energy, feelings of guilt or worthlessness, difficulty thinking or concentrating, easily overwhelmed, easy distractibility, memory impairment, and sleep disturbance. He said Winkel's prognosis was stable at the time but fragile because she was easily overwhelmed, which led to decompensations.

Dr. Ortell also opined on Winkel's mental functioning in the workplace. *See* R. 1137–38. He believed that Winkel had marked limitations in understanding and memory, concentration and persistence, and several adaptation abilities.[2] He further believed that Winkel would miss about four days of work each month due to her impairments or treatment and would need extra time to perform regular, routine tasks.

---

[2] The questionnaire defined "marked" as "more than moderate but less than extreme. A marked imitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis." R. 1137.

## II. Procedural Background

Winkel applied for social security benefits in September 2021. *See* R. 241–62. She alleged disability due to bipolar disorder, anxiety with panic, depression, post-traumatic stress disorder, migraine headaches, and severe neck pain. *See* R. 329–41. Winkel asserted that her impairments affected her ability to talk, hear, concentrate, and get along with others. *See* R. 342–49. She said she was easily and often stressed, she frequently had conflicts with others, and she struggled managing her time, money, and responsibilities. According to Winkel, her mind played tricks on her, she had difficulty following spoken instructions and getting along with authority figures, she was fired in the past due to issues getting along with others, and she sometimes struggled handling stress and changes in routine.

In April 2023, Winkel was examined by John Juern, a psychologist paid by the state agency charged with reviewing disability applications on behalf of the Social Security Administration. *See* R. 733–38. Dr. Juern noted that, during the exam, Winkel had a worried look on her face, lacked eye contact, and appeared rather distracted. Dr. Juern further noted that Winkel was oriented in all areas, was difficult to follow, and struggled remembering chronological information. When asked about the future, Winkel told Dr. Juern that she would like to have a full-time job at some point; however, she did not believe she was mentally capable at the time. Dr. Juern diagnosed bipolar disorder type II, generalized anxiety disorder, and an unspecified drug and alcohol use disorder (in remission). He noted that Winkel was working five to fifteen hours a week cleaning houses. According to Dr. Juern, that "seem[ed] to be a very appropriate job for her because she [was] able to work at her own pace and apparently on the days when she want[ed] to work." R. 738. Dr. Juern believed that "it would

7

be challenging for [Winkel] to work on a full-time basis." *Id.* However, he hoped that, with ongoing therapy, full-time work "would be an eventual possibility." *Id.*

Later that month, Winkel was examined by Abdihakim Mohamoud, a physician paid by the state agency to evaluate Winkel's physical impairments. *See* R. 739–46. Winkel told Dr. Mohamoud that her mental health prevented her from trying to do anything. Although she noted improved symptoms with medication, Winkel said she was sometimes overwhelmed with daily activities. She exhibited normal speech, memory, concentration, and affect; her behavior was within normal limits; she was well-dressed and groomed; and she appeared adequately nourished during her physical exam. However, she was tearful while explaining her medical history.

The state agency denied Winkel's applications initially and upon her request for reconsideration. *See* R. 76–123. The reviewing psychologists found that Winkel had a severe but not disabling mood disorder and anxiety. R. 79, 91, 103–04, 116–17. Specifically, the reviewing psychologists found that Winkel had a mild limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing herself.

After the state-agency denial, Winkel had a hearing with an ALJ. *See* R. 35–59. At the hearing, Winkel's lawyer amended the alleged disability onset date to January 1, 2021. R. 40. Winkel told the ALJ that she was working part time cleaning houses and driving for Lyft. R. 42. She said that was the maximum amount of work she could perform each week while maintaining some semblance of mental health. R. 47. According to Winkel, she was unable to work full time because she had a lot of difficulties concentrating and getting along with

8

others. R. 42–45. She said she was easily thrown off and agitated and had a hard time focusing. She also didn't like when people asked her what was wrong, and she came off as rude to others. Winkel described manic phases where she misbehaved and did inappropriate things, which affected her work in the past. Winkel indicated that her mental health also impaired her ability to be a good parent. But she believed that counseling and medications were helpful. R. 45–56.

A vocational expert also testified at the hearing. *See* R. 48–52. The vocational expert indicated that a hypothetical person with Winkel's age and vocational profile could work as a kitchen helper, a hand packager, and a cook helper if she were limited to a restricted range of medium exertional work. R. 49–50. The vocational expert further indicated that employers typically tolerate employees to be absent (unexcused) no more than once per month and to be off task no more than ten percent of the workday. R. 50. According to the vocational expert, a person couldn't work if she were unable to accept and listen to criticism from a supervisor. R. 51–52.

On June 14, 2024, the ALJ issued a written decision finding that Winkel was not disabled. *See* R. 12–34. The ALJ considered the disability applications under 20 C.F.R. §§ 404.1520, 416.920, which set forth a five-step process for evaluating DIB and SSI claims. *See* R. 15–29. Relevant here, the ALJ determined at steps two and three of that process that Winkel suffered from severe but not presumptively disabling bipolar disorder and generalized anxiety disorder. R. 18–21. Between steps three and four, the ALJ determined that Winkel had the residual functional capacity to perform a restricted range of medium work, including that she could understand, remember, and carry out simple instructions; she could maintain attention, concentration, persistence, and pace for two-hour segments; she could use judgment

9

to make simple work-related decisions; she could deal with occasional changes in a routine work setting; and she could occasionally interact with supervisors, coworkers, and the public. R. 21.

In assessing that RFC, the ALJ considered Winkel's subjective allegations, the objective medical evidence, and the medical opinion evidence. *See* R. 21–27. The ALJ noted that Winkel alleged disability based primarily on her mental impairments. R. 21. The ALJ further noted that Winkel asserted her mental impairments affected her ability to concentrate, get along with others, handle stress, handle changes in routine, and tend to her daily activities.

The ALJ determined that Winkel's statements concerning the intensity, persistence, and limiting effects of her symptoms were not reasonably consistent with the evidence in the record. *See* R. 21–23. The ALJ acknowledged that the record provided "some objective basis" for Winkel's alleged mental symptoms, as she had a long history of bipolar disorder and anxiety. R. 22. However, according to the ALJ, Winkel's treatment since the amended alleged onset date was "minimal and generally limited to medication management with few complaints of exacerbated symptoms." R. 22. The ALJ summarized Winkel's therapy and psychiatry records, noting that she reported struggling to handle the moods of her youngest child and having passive suicidal ideation and that providers observed her to be slightly anxious with pressured speech and slight paranoid thinking. R. 22–23 (citing Exhibit B7F). But the ALJ said that Winkel's mental status exams were otherwise normal. The ALJ also summarized the consultative exams with Dr. Juern and Dr. Mohamoud.[3] R. 23 (citing Exhibits B5F; B6F). Finally, the ALJ discussed the most recent therapy records, during which

---

[3] The ALJ mistakenly attributed the physical consultative exam to Tracy Bretl, *see* R. 23, but he accurately described the underlying findings of that exam, *see* R. 739–46.

Winkel reported doing well and feeling more grounded following a medication change and presented with normal exam findings. R. 23 (citing Exhibits B11F; B13F).

The ALJ also considered the medical opinion evidence. *See* R. 23–27. According to the ALJ, Dr. Juern opined that Winkel "could work no more than 5–15 hours per week, limiting her to part-time work because it would be challenging for [her] to work on a full-time basis." R. 25. The ALJ found Dr. Juern's opinion unpersuasive because it was not "a function-by-function assessment of [Winkel's] limitations despite her mental health conditions," it was "out of proportion to the clinical findings from [Dr. Juern's] examination record," it "appear[ed] to rely heavily on subjective reports of functioning/abilities rather than clinical observations," and it was "not supported by [Winkel's] treatment records and mental status examination findings." R. 25. The ALJ also found unpersuasive Dr. Ortell's opinions that Winkel had marked limitations in several areas of mental functioning and would miss about four days of work per month because of her conditions. R. 26–27. According to the ALJ, Dr. Ortell's opinions were "significantly out of step with [his] clinical findings and unsupported by the mental status and psychological findings of other medical providers and examining sources within the record." R. 26.

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Winkel did not have any past relevant work. R. 27. Relying on the vocational expert's testimony, the ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Winkel could still perform. R. 27–28. Based on the step-five finding, the ALJ determined that Winkel was not disabled from her amended alleged onset date through the date of the decision. R. 28.

11

The Social Security Administration's Appeals Council denied Winkel's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)).

In September 2024, Winkel filed this action seeking judicial review of the Commissioner's decision denying her claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* Compl., ECF No. 1. The matter was reassigned to this court after all parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 6 & 8. Winkel filed a brief in support of her disability claim, *see* ECF No. 16; the acting commissioner of the Social Security Administration filed a brief in support of the ALJ's decision, *see* ECF No. 24; and Winkel filed a reply brief, *see* ECF No. 27.

## LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, modify, or reverse the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*,

950 F.3d at 373 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Winkel seeks remand for rehearing, arguing that the ALJ erred in evaluating her alleged mental symptoms and certain medical opinion evidence.

## I. The ALJ's Subjective-Symptom Evaluation Lacks Logical Support in the Record

Winkel generally alleged that her mental impairments affected her ability to concentrate, get along with others, and handle stress. *See* R. 41–47, 342–49. The ALJ determined that the record did not support Winkel's allegations regarding the intensity, persistence, and limiting effects of those symptoms because her treatment was minimal, she rarely complained of exacerbated symptoms, and her mental status exams were generally normal. *See* R. 21–23. Winkel challenges the reasons the ALJ offered for discrediting her alleged mental symptoms, arguing that the ALJ mischaracterized certain evidence and ignored evidence contrary to his conclusion.

ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* Social Security Ruling No. 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, 2016 SSR LEXIS 4, at *3

13

(Mar. 16, 2016) (citing 20 C.F.R. §§ 404.1529, 416.929). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms . . . and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. At the second step, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10. When reviewing evidence other than objective medical evidence, the ALJ may consider several factors, including the type, dosage, effectiveness, and side effects of the claimant's medications. *Id.* at *18–19; *see also* §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* (citing *Murphy*, 759 F.3d at 816). "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record.'" *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

The record does not support the ALJ's characterization of Winkel's mental health treatment as minimal. During the relevant period, Winkel regularly attended individual

14

psychotherapy and saw a psychiatrist for medication management. *See* Pl.'s Br. 10 (citing 55 assessments, psychiatric appointments, and therapy sessions over a three-year period). The ALJ seemed to suggest that, if Winkel's mental impairments truly were disabling, she would have sought more aggressive treatment. But the ALJ never specified what that treatment would look like. Winkel's providers recommended only therapy and psychotropic medications, and Winkel complied with those recommendations. *See, e.g.*, 725, 755–56, 927 (noting that bipolar disorder is treated via psychotropic medications and individual therapy), 981 (noting that bipolar disorder is a serious and persistent mental illness that often requires lifelong mental health services). Moreover, the ALJ failed to explain how the lack of emergency or inpatient care during the relevant period—recall that Winkel had been institutionalized in the past—suggested that Winkel had exaggerated the intensity, persistence, or limiting effects of her mental impairments. *See Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015) ("The institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves.").

The ALJ also overstated the extent to which treatment controlled Winkel's symptoms when he indicated that treatment was limited to medication management and that Winkel rarely complained of exacerbated symptoms. Winkel resumed mental health treatment in 2021 because of her shifting moods and anxiety. *See* R. 715–16, 753–56. She was diagnosed with bipolar disorder and prescribed Lamictal. Although Winkel reported feeling a little bit better after going back on meds, she continued to experience significant mental health symptoms. *See* R. 717. For example, Winkel's therapists and psychiatrists regularly documented an anxious affect; disorganized, racing, and tangential thoughts; rapid and

15

pressured speech; a tearful mood; signs of distress; mood instability; and anxiety interfering with her capacity to complete tasks. *See* R. 599–600, 718–19, 757–59, 763–67, 922, 925, 932, 953, 1003, 1012, 1145. The ALJ largely glossed over Winkel's ongoing symptoms despite therapy and medication and presented a lopsided view of the mental health evidence. *See* R. 22–23.

But those symptoms did not go unnoticed by Winkel's psychiatrists, who continued to adjust her medication regimen. Dr. Knoedler twice increased Winkel's Lamictal dosage before adding Seroquel. *See* R. 716–19. When Dr. Klimchuck took over, she increased the Seroquel dosage at three consecutive appointments and added Buspar. *See* R. 720–23. Dr. Ortell apparently didn't believe those medications were sufficiently controlling Winkel's symptoms, as he added Lithium, Risperdal, Wellbutrin, and Valium. *See* R. 724–26, 766, 932. At the time of the administrative hearing, Winkel was taking six different psychotropic medications. *See* R. 45–46, 1145.

The psychiatrists' attempts to rein in Winkel's mental symptoms with increased dosages and the addition of (and never the substitution of) new medications appear to support the persistence of Winkel's symptoms despite treatment. *See* SSR 16-3p, 2016 SSR LEXIS 4, at *22–23 ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."). However, the ALJ did not acknowledge the constant medication adjustments. *See* R. 22–23. The only thing the ALJ said about changes to medication was that Winkel reported doing well and feeling grounded after a

medication change in 2024. R. 23 (citing Exhibit B11F).[4] Social security regulations and rulings required the ALJ to more carefully consider the type, dosage, and effectiveness of Winkel's medications. *See* §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); *see also* SSR 16-3p, 2016 SSR LEXIS 4, at *18–19. That seems especially critical in a case involving bipolar disorder, the defining feature of which is fluctuating symptoms.

Winkel also criticizes the ALJ for relying on Bechle's therapy records. According to Winkel, the ALJ should have questioned Bechle's "clearly boilerplate findings." Pl.'s Br. 11. Bechle did appear to use templates for his mental status findings:

> Heidi presented in person at SCHHS. Client was euthymic and presented well-groomed and oriented to person, place, and time. Client's affect is consistent with mood and denied SI, SNI, or THO.

> Heidi was on time and dressed appropriately for her appointment in person at SCHHS. Heidi was euthymic and affect congruent with mood. Heidi was oriented to person, place, and time, and denied thoughts of SI, NSSI, or THO.

*See* R. 768–70, 916–19, 921–24, 926–28, 930–31, 987. But it's unsurprising—and more importantly here, unproblematic—for a busy therapist to take a transcription shortcut.

Aside from pointing out that Bechle repeated the exact same findings for nearly every therapy session, Winkel does little to substantiate her skepticism. The best she can come up with is that Bechle noted during two therapy sessions that Winkel was euthymic even though she was tearful at times. *See* Pl.'s Br. 11 (citing R. 922, 1012). At the first session, Winkel was tearful as she processed feeling pressure to always do good. R. 922. Similarly, at the second session, Winkel became tearful as she opened up about struggling to balance her responsibilities as a single parent. R. 1012. Winkel has not demonstrated that those brief, reasonable reactions to specific stressors were inconsistent with euthymia. After all,

---

[4] Exhibit B11F is 74 pages. *See* R. 906–79. It appears the ALJ was referring to therapy sessions in February and March 2024 when Winkel reported doing well and feeling grounded after being prescribed new medications following a significant exacerbation in symptoms. *See* R. 916–17; *see also* R. 1003.

individuals in a euthymic state are "not necessarily asymptomatic or without any signs of a patient's bipolar disorder." *Elizabeth N.W. v. Kijakazi*, No. 3:21-cv-008, 2022 WL 278661, 2022 U.S. Dist. LEXIS 16690, at *14–15 (N.D. Ind. Jan. 31, 2022) (citing Giovanni A. Fava & Per Bech, *The Concept of Euthymia*, Psychotherapy and Psychosomatics (Nov. 27, 2015), *available at* https://www.karger.com/Article/Pdf/441244)). Thus, there was no reason for the ALJ to set aside Bechle's clinical observations.

Because the ALJ mischaracterized Winkel's mental health treatment and ignored other significant evidence, her decision not to credit Winkel's bipolar and anxiety symptoms lacks support in the record.

## II.    The ALJ Erred in Evaluating Certain Medical Opinion Evidence

The ALJ applied the new social security regulations for evaluating medical opinions, as Winkel applied for disability benefits on or after March 27, 2017. *See* R. 21 (citing 20 C.F.R. §§ 404.1520c, 416.920c). Under the new regulations, the ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the ALJ must consider the persuasiveness of all medical opinions in the record using five factors: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. *See* 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

Although an ALJ may consider all five factors, "the most important factors" are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2), 416.920c(a), 416.920c(b)(2). The supportability factor focuses on what the source brought forth to support his findings: "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more

18

persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor, on the other hand, compares the source's findings to evidence from other sources: "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ must explain in his decision how he considered the supportability and consistency factors for each medical opinion in the record. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may, but doesn't need to, explain how he considered the other three factors. *Id.*

Winkel challenges the ALJ's evaluation of the medical opinions offered by Dr. Juern (the consultative examining psychologist) and Dr. Ortell (Winkel's treating psychiatrist).

### A.    The ALJ Failed to Provide a Good Explanation for Rejecting Dr. Juern's Opinion

Dr. Juern was paid by the state agency to examine Winkel and author a report of his findings. *See* R. 733–38. In the statement of work capacity section of his report, Dr. Juern indicated that Winkel's job cleaning houses five to fifteen hours a week seemed to be a very appropriate job for her because she was able to work at her own pace and on the days she wanted to work. R. 738. He also indicated that, at the time he authored his report, it would have been challenging for Winkel to work on a full-time basis. The ALJ found Dr. Juern's opinion unpersuasive because he did not offer a function-by-function assessment of Winkel's limitations, his opinion was out of proportion with his own clinical findings, his opinion appeared to rely heavily on Winkel's subjective reports, and his opinion was not supported by the other treatment records and mental status exam findings. R. 25. Winkel takes issue with each of the four reasons the ALJ offered for rejecting Dr. Juern's medical opinion.

19

Consultative examiners are "unlikely . . . to exaggerate an applicant's disability." *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013) (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). "As a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence." *Beardsley*, 758 F.3d at 839. "[B]ut *rejecting* the opinion of an agency's doctor that supports a disability finding is 'unusual' and 'can be expected to cause a reviewing court to take notice and await a good explanation.'" *Jones v. Saul*, 823 F. App'x 434, 439 (7th Cir. 2020) (quoting *Beardsley*, 758 F.3d at 839).

The ALJ here failed to provide a good explanation for his unusual step of rejecting Dr. Juern's opinion. "First, the Social Security regulations do not require a function-by-function analysis." *Laura G. v. O'Malley*, No. 23-cv-1651, 2024 WL 4226273, 2024 U.S. Dist. LEXIS 168219, at *6–7 (N.D. Ill. Sept. 18, 2024) (quoting *Diaz v. Berryhill*, No. 15 C 11386, 2017 WL 497768, 2017 U.S. Dist. LEXIS 16820, at *9–10 (N.D. Ill. Feb. 7, 2017)). In fact, a consultative report need not even contain a medical opinion, *see* 20 C.F.R. §§ 404.1519n(c)(6), 416.919n(c)(6), and the ALJ could have requested clarification from Dr. Juern if he believed the report was inadequate or incomplete, *see* 20 C.F.R. §§ 404.1519p(b), 416.919p(b). While succinct, Dr. Juern did express an opinion about Winkel's work capacity (part-time work was appropriate for Winkel, but full-time work would be too much mentally) and provide his reasoning (Winkel's part-time job allowed her to work at her own pace and on her own schedule).

Second, the ALJ failed to explain how Dr. Juern's clinical findings were out of proportion with his opinion. The ALJ did not mention any specific findings when evaluating Dr. Juern's opinion. *See* R. 25. However, when discussing the consultative exam earlier in his

20

decision, the ALJ noted several abnormal findings: Winkel made poor eye contact, she appeared distracted, she was difficult to follow, and she was a poor historian. R. 23 (citing Exhibit B5F). Dr. Juern also noted that Winkel had a worried look on her face during the exam and struggled with a memory test. *See* R. 733–38. The ALJ therefore acknowledged that Dr. Juern observed deficits in concentration, memory, and train of thought, as well as evidence of anxiety. But the ALJ did not explain why those abnormal findings did not support Dr. Juern's opinion that Winkel lacked the mental capacity for full-time work.

Third, "it's illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms." *Aurand v. Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016). "[A] psychological assessment is by necessity based on the patient's report of symptoms and responses to questioning." *Id.* That observation is especially true in a case involving bipolar disorder, which cannot be confirmed via any objective test. *See id.*; *see also Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) ("Mental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional expertise.") (citing *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015)).[5] Here, Dr. Juern rendered his opinion after interviewing Winkel, observing her, and documenting several signs and symptoms of bipolar disorder and generalized anxiety disorder. The fact that Dr. Juern relied on Winkel's subjective reports was both expected and necessary, not a reason to question his professional judgment.

---

[5] The acting commissioner did not address any of the authority Winkel relied upon for this argument. *See* Def.'s Mem. 8–9.

Finally, the ALJ failed to sufficiently consider the consistency of Dr. Juern's opinion with other evidence in the record. The ALJ said that Dr. Juern's opinion was not "supported" by Winkel's treatment records and mental status exam findings, R. 25; it appears he meant to say the opinion was not *consistent* with the other record evidence. *See* §§ 404.1520c(c), 416.920c(c) (explaining the difference between supportability and consistency). Again, the ALJ didn't mention any specific treatment records or exam findings when evaluating Dr. Juern's opinion. *See* R. 25. Rather, he appeared to be referencing his previous discussion of the objective medical evidence. *See* R. 22–23. Normally an ALJ need not repeat evidence throughout his decision. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) ("To require the ALJ to repeat such a discussion throughout his decision would be redundant.") (citations omitted). But in this case, the ALJ acknowledged both normal and abnormal findings, and he ignored significant evidence, including ongoing symptoms despite therapy and constant adjustments to medication. Thus, the lack of explanation connecting the evidence to the ALJ's decision to reject Dr. Juern's opinion precludes meaningful judicial review.

### B. The ALJ Failed to Evaluate Dr. Ortell's Opinions in Accordance with Binding Social Security Regulations

At the time of the ALJ's decision, Dr. Ortell had been Winkel's treating psychiatrist for about a year and a half. *See* R. 1136. In June 2024, Dr. Ortell completed a mental impairment questionnaire in which he opined that Winkel had marked limitations in several areas of mental functioning, would miss about four days of work per month because of her conditions, and would need extra time to perform regular, routine tasks. *See* R. 1136–38. The ALJ found Dr. Ortell's opinions unpersuasive because they were "significantly out of step with" his own clinical findings and "unsupported" by the mental status and psychological findings of other medical providers and examining sources within the record. R. 26–27.

22

Winkel argues that the ALJ failed to comply with binding social security regulations when evaluating Dr. Ortell's opinions; I agree.

Although the ALJ mentioned some of Dr. Ortell's own exam findings, *see* R. 23 (citing Exhibit B7F) (noting Winkel's presentation at follow-up psychiatry appointments), he completely failed to address the supporting explanation Dr. Ortell offered within the questionnaire. Dr. Ortell listed several clinical findings, including the results of mental status exams, that demonstrated the severity of Winkel's impairments and symptoms: an unstable sleep cycle; an ability to manage only a simple, highly structured routine; a lot of anxiety; many past failures attempting to work full time; and limited ego strength. R. 1136. He also described Winkel's prognosis as "currently stable but fragile," given that Winkel was easily overwhelmed (leading to decompensations). *Id.* Finally, Dr. Ortell checked boxes endorsing several signs and symptoms, including appetite disturbance with weight change, decreased energy, feelings of guilt or worthlessness, difficulty thinking or concentrating, easily overwhelmed, easy distractibility, memory impairment, and sleep disturbance. *Id.*

The ALJ's failure to consider Dr. Ortell's supporting explanation was legal error, *see* §§ 404.1520c(b)(2), 404.1520c(c)(1), 416.920c(b)(2) 416.920c(c)(1), which the acting commissioner does not attempt to excuse as harmless. *See Bakke v. Kijakazi*, 62 F.4th 1061, 1068 (7th Cir. 2023) ("ALJs should give more weight to medical opinions with more internal explanation and support than to those without.") (citation omitted); *Warrior v. Kijakazi*, 583 F. Supp. 3d 1191, 1204 (E.D. Wis. 2022) ("[T]he social security regulations require that the ALJ consider the medical professional's explanation *and* the objective medical evidence presented by the medical source."); *Peterson v. Comm'r*, No. 22-CV-1106-SCD, 2023 WL

6366595, 2023 U.S. Dist. LEXIS 175091, at *16–19 (E.D. Wis. Sept. 29, 2023) (finding error where an ALJ failed to mention an examining doctor's supporting explanation).

The ALJ also erred when addressing the consistency factor. Again, he conflated supportability and consistency, finding Dr. Ortell's opinions "unsupported" by other evidence in the record. The ALJ also failed to explain *how* Dr. Ortell's opinions were inconsistent with other providers' findings, which included both normal and abnormal results. And the ALJ downplayed Winkel's ongoing mental symptoms despite compliance with treatment.

## CONCLUSION

In sum, the ALJ's subjective-symptom evaluation lacks logical support in the record, the ALJ failed to provide a good explanation for rejecting the opinion of the agency's own examining psychologist, and the ALJ didn't comply with binding social security regulations when assessing the opinions of Winkel's treating psychiatrist. Accordingly, for all the foregoing reasons, I **REVERSE** the Social Security Commissioner's final decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 22nd day of July, 2025.

STEPHEN C. DRIES
United States Magistrate Judge